# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| DAVID DUMAS, | Case No. 1:12-cv-01355-LJO-JLT (PC) |
|---|---|
| Plaintiff, | **FINDINGS AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Dr. E. BANGI, | **(Doc. 32)** |
| Defendant. | **OBJECTIONS DUE WITHIN THIRTY (30) DAYS** |

## I. Procedural History

Plaintiff, David Dumas, is a state prisoner proceeding pro se and in forma pauperis in this civil rights action under 42 U.S.C. § 1983 against Defendant, Dr. E. Bangi, for deliberate indifference to his serious medical needs in violation of the Eighth Amendment.[1] (*See* Docs. 1, 8.)

On November 21, 2013, Dr. Bangi filed a motion for summary judgment arguing that it should be granted because: (1) the evidence does not show or support a reasonable inference that he was deliberately indifferent in his treatment of Plaintiff's lower back pain, and (2) Dr. Bangi is entitled to qualified immunity because a reasonable physician in his position could have thought that his course of treatment was both medically appropriate and lawful. (Doc. 32.) Plaintiff requested and received extensions of time to file his opposition[2] (*see* Docs. 35, 36, 39,

---

[1] Defendants St. Clair, Tomatos, and Forster have been dismissed from this action. (Doc. 20.)

[2] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in

1  40) with which he complied (Docs. 46, 47, 48, 49).³  Defendant did not file a reply.  The motion
2  is deemed submitted.  Local Rule 230(l).
3    Having read and considered the pleadings, and for the reasons set forth below, the Court
4  recommends granting Defendant's motion for summary judgment.

5  **II.    Summary Judgment Standard**

6    Any party may move for summary judgment.  The Court shall grant summary judgment if
7  the movant shows that there is no genuine dispute as to any material fact and the movant is
8  entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted);
9  *Washington Mutual Inc. v. U.S.,* 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position,
10 whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular
11 parts of materials in the record, including but not limited to depositions, documents, declarations,
12 or discovery; or (2) showing that the materials cited do not establish the presence or absence of a
13 genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.
14 Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the
15 record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); *Carmen*
16 *v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v.*
17 *Navajo County, Ariz.,* 609 F.3d 1011, 1017 (9th Cir. 2010).

18   Defendant does not bear the burden of proof at trial and in moving for summary judgment
19 need only prove an absence of evidence to support Plaintiff's case.  *In re Oracle Corp. Securities*
20 *Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,
21 106 S.Ct. 2548 (1986)).  If Defendant meets his initial burden, the burden then shifts to Plaintiff
22 "to designate specific facts demonstrating the existence of genuine issues for trial."  *In re Oracle*
23 *Corp.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323).  This requires Plaintiff to "show
24 more than the mere existence of a scintilla of evidence."  *Id.* (citing *Anderson v. Liberty Lobby,*
25 *Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

---

an order filed on December 9, 2013.  *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

³ All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), *cert. denied*, 132 S.Ct. 1566 (2012).  The Court determines *only* whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner.  *Thomas v. Ponder*, 611 F3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

### III.     Plaintiff's Claims Against Defendant Bangi[4]

At all times relevant to his complaint, Plaintiff was a state prisoner confined in the Sierra Conservation Center ("SCC") located in Jamestown, California. (Doc. 1 at ¶ 4.)  Plaintiff alleges that he suffers from chronic back pain that interferes with, among other things, his ability to sleep. (*Id*. at ¶9.)  Defendant Bangi was a yard physician at Facility C and Plaintiff's primary care physician.  (*Id*. at ¶¶ 5-8.)

While no date is provided, Plaintiff described his chronic back pain to Defendant Bangi during his first meeting with Bangi. (*Id*. at ¶ 10.) Dr. Bangi prescribed aspirin for Plaintiff. (*Id*.) On subsequent visits with Defendant Bangi, Defendant Bangi terminated the consultation whenever Plaintiff would mention his back pain.  (*Id*. at ¶ 13.)  Dr. Bangi neither referred Plaintiff to a specialist; nor provided Plaintiff with any further pain medication.  (*Id*. at ¶ 15.)

These allegations were found to state a cognizable claim against Dr. Bangi for deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment (Doc. 20, 23) and provide the parameters for both this action and Defendant's motion for summary judgment.

---

[4] This is a rendition of the factual allegations upon which Plaintiff's claims against Defendant were found cognizable which are presented here for overview purposes only.  Undisputed and disputed material facts are discussed where applicable in the following sections.

**A. Eighth Amendment**

To maintain an Eighth Amendment claim based on medical care in prison, a plaintiff must first "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendants' response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quotation marks omitted)).

The existence of a condition or injury that a reasonable doctor would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities, and the existence of chronic or substantial pain are indications of a serious medical need. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citing *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)) (quotation marks omitted); *Doty v. County of Lassen*, 37 F.3d 540, 546 n.3 (9th Cir. 1994). For purposes of this motion, Defendant "does not dispute that Plaintiff's chronic back pain was a serious medical condition." (Doc. 32-1, D's MSJ, 18:9-10.)

Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer*, 511 U.S. at 835 (quoting *Whitley*, 475 U.S. at 319). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.* (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002)).

In medical cases, this requires showing: (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Wilhelm*, 680 F.3d at 1122 (quoting *Jett*, 439 F.3d at 1096). More generally, deliberate indifference "may

4

appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* (internal quotation marks omitted). Under *Jett*, "[a] prisoner need not show his harm was substantial." *Id.*; *see also McGuckin*, 974 F.2d at 1060 ("[A] finding that the defendant's activities resulted in 'substantial' harm to the prisoner is not necessary.").

## IV. Defendant's Motion[5]

### A. Defendant's Statement of Undisputed Facts

Defendant's presentation of undisputed facts upon which his motion is based illustrates the efforts that Defendant took attempting to treat Plaintiff's chronic pain condition, the similar attempts by other physicians who also saw and treated Plaintiff, Plaintiff's medical history, and the impact of Plaintiff's history of substance abuse on Defendant's treatment of Plaintiff.

Defendant states that Plaintiff has been in and out of CDCR's custody since 1992. (Doc. 32-2, D's Statement of Undisputed Facts ("SUF") 1.) He was housed at the Sierra Conservation Center (SCC) during the events at issue in this case. (SUF 2.)

**1. Plaintiff's history of substance abuse**.

Plaintiff is 41 years old. (SUF 3.) He began using heroin as a teenager. (SUF 4.) He also used marijuana regularly as a teen. (SUF 5.) To this day, marijuana remains Plaintiff's "drug of choice." (SUF 6.) Plaintiff has also used methamphetamine recreationally "on and off" for many years. (SUF 7.)

In April 2006, a police officer found heroin in the driver's-side door of Plaintiff's car during a parole search. (SUF 8.) Plaintiff was convicted of one count of possession of a controlled substance shortly afterwards. (SUF 9.) He was sentenced to 32 months in state prison for that felony conviction, but he paroled in May 2008 after serving 25 months. (SUF 10.) Four months later, police officers found two bags of methamphetamine and heroin in Plaintiff's car once again during a routine traffic stop. (SUF 11.) Plaintiff was arrested, convicted of two counts of

---

[5] The Court has reviewed Plaintiff's complaint, the motion for summary judgment and the opposition, but declines to exhaustively list every argument presented, every fact recited, and every piece of evidence submitted by the parties. Omission in this order of reference to various arguments, facts, or evidence should not be interpreted by the parties as an indication that the Court overlooked that argument, fact, or piece of evidence.

5

possession of a controlled substance, and sentenced to three years in state prison for those felony convictions. (SUF 12.)

Plaintiff's history of substance abuse is documented in his central inmate file and in his medical file. (SUF 13.) Dr. Bangi considered this when he treated Plaintiff because a history of substance abuse is often correlated with medication-seeking behavior in patients complaining of chronic pain. (SUF 14.)

### 2. After Plaintiff injured his back in 2001, CDCR doctors tried various nonnarcotic medications to manage Plaintiff's lower back pain.

Plaintiff injured his back while working at his prison job in 2001. (SUF 15.) He had never experienced back pain before. (SUF 16.) In the years that followed, CDCR doctors referred Plaintiff to an outside specialist, they ordered an MRI scan of Plaintiff's spine, and they scheduled Plaintiff for back surgery in 2004. (SUF 17.) Several other doctors recommended that Plaintiff be included in CDCR's disability placement program. (SUF 18.) This meant that he was eligible for certain disability-related accommodations in his housing unit, like lower-tier and lower-bunk assignments. (SUF 19.)

In terms of medications, Plaintiff was taking Prednisone after his injury in 2001. (SUF 20.) Prednisone is a non-narcotic steroid often prescribed for sharp nerve pain. (SUF 21.) Although this was mildly effective, Plaintiff says that he still suffered from back pain. (SUF 22.) In the ensuing years, CDCR doctors also prescribed Tylenol and Gabapentin to manage Plaintiff's pain. (SUF 23.) Like Prednisone, Gabapentin is a non-narcotic drug used to treat chronic nerve pain. (SUF 24.) Plaintiff's pain continued for several years despite the litany of non-narcotic drugs that he tried. (SUF 25.)

### 3. In November 2008, a CDCR doctor prescribed methadone for Plaintiff's lower back pain.

In November 2008, Plaintiff returned to CDCR custody. (SUF 26.) He was housed at Wasco State Prison during his intake. (SUF 27.) There, a CDCR doctor prescribed methadone as part of Plaintiff's pain management regimen. (SUF 28.) This was the first time a CDCR doctor had prescribed a narcotic for Plaintiff. (SUF 29.)

6

Methadone is listed as a Schedule II controlled substance by the Controlled Substances Act, 21 U.S.C. § 812. (SUF 30.) It is a synthetic opioid known to be uncommonly effective in managing chronic pain, but it is also highly addictive. (SUF 31.) When treating patients with chronic pain, most doctors try to experiment with many different over-the-counter analgesics (pain relievers) and other anti-inflammatory drugs before ever considering narcotics as a treatment option. (SUF 32.)

Plaintiff took methadone continuously for the next 14 months, until he paroled in March 2010. (SUF 33.)

**4. After Plaintiff returned to CDCR custody in November 2010, doctors did not renew his methadone prescription, and they removed him from CDCR's disability placement program.**

In November 2010, Plaintiff returned to CDCR custody. (SUF 34; SUF 35.) Plaintiff was housed at California State Prison, Los Angeles (CSP-Los Angeles) as he was being processed back into the CDCR system. (SUF 36.) Doctors there did not renew Plaintiff's methadone prescription. (SUF 37.) Moreover, the doctors at CSP-Los Angeles decided to remove Plaintiff from CDCR's disability placement program. (SUF 38.) This was based on Plaintiff's observable behaviors, such as his repeated refusals to participate in physical therapy, and his ability to walk great distances without any apparent difficulty. (SUF 39.)

Plaintiff's lumbar spine was x-rayed at CSP-Los Angeles in December 2010. (SUF 40.) The radiologist reported finding "no visible laminectomy" when she read the x-rays. (SUF 41.) Dr. Bangi thought this finding was both highly unusual and relevant when he treated Plaintiff several months later. (SUF 74-80.)

**5. From March 2011 to August 2012, Dr. Bangi refused to prescribe Plaintiff methadone, finding that it was not medically indicated, but Dr. Bangi tried various other treatment options to help Plaintiff manage his alleged pain.**

**a. The initial evaluation on March 11, 2011.**

In late-February 2011, Plaintiff transferred to the Sierra Conservation Center in Jamestown, California. (SUF 42.) Plaintiff saw Dr. Bangi two weeks later, on March 11, 2011,

1  for his initial evaluation. (SUF 43.) During this visit, Plaintiff asked Dr. Bangi for methadone.
2  (SUF 44.) Dr. Bangi refused, finding that the narcotic was not medically indicated at the time.
3  (SUF 45.) There were several factors Dr. Bangi considered in arriving at this decision. (SUF 46.)
4        First, as Plaintiff's new primary care physician, Dr. Bangi wanted to start with a
5  conservative pain-management regimen, consisting of over-the-counter pain relievers and other
6  non-steroidal anti-inflammatory drugs (NSAIDs), which are generally safer than opioids. (SUF
7  47.) Dr. Bangi thought that if this cautious approach was unsuccessful after a trial period, he
8  could try increasing the dosages or experiment with different combinations of NSAIDs before
9  advancing to more aggressive pain medications. (SUF 48.)
10       Second, Dr. Bangi did not have Plaintiff's complete medical file before him at the March
11 2011 exam. (SUF 49.) Dr. Bangi only had access to the second volume of Plaintiff's two-volume
12 record. (SUF 50.) This was critical because Plaintiff claimed that he had surgery on his back at
13 Harbor UCLA Medical Center in 2008, and that he had an MRI scan at the California
14 Correctional Institution (Tehachapi State Prison) in 2010. (SUF 51.) Dr. Bangi could not find any
15 documents to support either of these claims. (SUF 52.) So, he asked a medical technician to locate
16 the first volume of Plaintiff's medical record, and to gather any relevant documents from Harbor
17 UCLA and Tehachapi State Prison. (SUF 53.) Dr. Bangi wanted to conduct a complete review of
18 Plaintiff's medical history before considering any treatment options beyond over-the-counter
19 analgesics and NSAIDs. (SUF 54.)
20       At the time of their initial meeting, Plaintiff was taking Tylenol and Sulindac to manage
21 his pain. (SUF 55.) Sulindac is an NSAID used to treat mild-to-moderate pain and inflammation.
22 (SUF 56.) These medications had recently been prescribed at CSP-Los Angeles. (SUF 57.)
23 Plaintiff had also taken Ultram while he was there. (SUF 58.) During the meeting, Plaintiff told
24 Dr. Bangi that he took Naproxen, Ibuprofen, and Indomethacin among many other drugs, and that
25 none had been effective in decreasing his pain. (SUF 59.) Plaintiff said that his back was in
26 constant pain, and he did not want any intervention short of re-prescribing methadone.
27 (SUF 60.)
28       Based on his review of Plaintiff's available records, and his discussion with Plaintiff

during the initial meeting, Dr. Bangi determined there was no indication for narcotic medications, especially the methadone Plaintiff was seeking.. (SUF 61.) Dr. Bangi also determined that Plaintiff had no current need for a lower tier or lower bunk chrono, or for any other disability related accommodation chronos. (SUF 62.) This was based largely on another physician's report that had been prepared at CSP-Los Angeles just one month earlier, finding that Plaintiff did not have a mobility impairment and did not require any accommodation chronos. (SUF 63.)

Before the meeting concluded, Dr. Bangi recommended that Plaintiff begin a home exercise program and that he engage in routine physical therapy. (SUF 64.) Plaintiff was not interested in physical therapy. (SUF 65.) Dr. Bangi found this unusual because physical therapy can be highly effective in mitigating chronic back pain. (SUF 66.) This initial meeting lasted 15-20 minutes. (SUF 67.)

**b. The follow up appointment on April 26, 2011.**

Dr. Bangi met with Plaintiff six weeks later, on April 26, 2011, for a follow up. (SUF 68.) Dr. Bangi was still concerned that Plaintiff had refused, and continued to refuse, physical therapy, and was continually asking for reinstatement of his methadone prescription. (SUF 69.) Dr. Bangi thought it was relevant that doctors at CSP-Los Angeles refused this request and one of Plaintiff's treating physicians at Tehachapi State Prison charted in 2009 that Plaintiff needed to be tapered down from his methadone. (SUF 70.)

Dr. Bangi also found Plaintiff's complaints troubling for another reason. (SUF 71.) The medical technician who contacted Harbor UCLA (to gather records concerning Plaintiff's claimed back surgery in 2008), reported that Harbor UCLA did not have any records of ever treating Plaintiff. (SUF 72.) Similarly, the technician had contacted Tehachapi State Prison to request records concerning an MRI conducted in 2010, but Tehachapi did not have any such records, and there were no related documents in Plaintiff's medical file. (SUF 73.)

One record that did exist that Dr. Bangi found problematic was a radiologist's report from December 2010. (SUF 74.) Plaintiff's lumbar spine was x-rayed while he was housed at CSP-Los Angeles. (SUF 40.) The radiologist who read the x-ray found mild osteopenia (i.e., decreased calcium content) and minimal multilevel spurring -- neither of which were remarkable. (SUF 75.)

9

What Dr. Bangi found noteworthy was the fact that the radiologist reported seeing "no visible laminectomy" on Plaintiff's spine. (SUF 76.) A laminectomy is a surgical procedure that removes a portion of the vertebral bone called the lamina that may be compressing a nerve or disk. (SUF 77.) If Plaintiff underwent a laminectomy in 2008, as he claimed, some evidence of the procedure (i.e., missing portions of the lamina) should have been visible on his x-ray. (SUF 78.) Dr. Bangi began to question whether Plaintiff had ever had a back surgery in 2008, and the growing inconsistencies in Plaintiff's story caused him to further question whether Plaintiff genuinely required treatment with methadone. (SUF 79, 80.)

When Dr. Bangi concluded the April 26, 2011 exam, he explained to Plaintiff that he did not think methadone was advisable, and that he wanted to continue with the current medication regimen of Tylenol and Mobic. (SUF 81.) Dr. Bangi had recently discontinued Plaintiff's Sulindac prescription and replaced it with Mobic, another NSAID used for general pain relief. (SUF 82.) NSAIDs as a class are fairly equal in terms of their potential for pain relief among the population at large, but their efficacy varies from one patient to another. (SUF 83.) Many patients try several NSAIDs before finding the one that works for them. (SUF 84.) This is why doctors generally experiment with many different NSAIDs before ever considering narcotics as a treatment option. (SUF 85.)

After Dr. Bangi told Plaintiff that a methadone prescription would not be forthcoming, Plaintiff became upset and left the clinic cursing. (SUF 86.) As he walked out, Plaintiff's gait was normal. (SUF 87.) This was far different than the pronounced limp that Dr. Bangi observed when Plaintiff arrived at the clinic that morning. (SUF 88.) This meeting with Plaintiff lasted 8-10 minutes. (SUF 89.)

Dr. Bangi recommended in his progress notes that Plaintiff's case be raised at the next Medical Authorization Review Committee meeting. (SUF 90.)

### c. Plaintiff's case was discussed at the Medical Authorization Review Committee in early May 2011.

Dr. Bangi presented Plaintiff's case to the Medical Authorization Review Committee (MARC) the following week. (SUF 91.) The MARC is a body of medical providers that meets

weekly to discuss treatment plans for patients with chronic pain. (SUF 92.) Every institution in the CDCR system has a similar pain management committee. (SUF 93.)

At SCC, the MARC is comprised of the Chief Medical Officer, the Chief Physician & Surgeon, the Utilization Management Nurse (the highest-ranking Registered Nurse), and all staff physicians on shift. (SUF 94.) At MARC meetings, doctors bring their problem cases to the group. (SUF 95.) Typically, a doctor will present the patient's case history, lab results from SCC and other institutions, and the doctor's evaluation and findings then the MARC collectively develops a treatment plan. (SUF 96.) Treatment plans can include medications, physical therapy, referrals to outside specialists, or referrals for outside testing, such as an MRI scan. (SUF 97.) After the MARC has discussed the patient's case and arrived at an agreed-upon course of treatment, the physician discusses the committee's recommendations at the patient's next appointment. (SUF 98.)

### d. The May 10, 2011 appointment.

Dr. Bangi met with Plaintiff one week later, on May 10, 2011, to discuss the committee's findings. (SUF 99.) The MARC had collectively determined that no narcotics were indicated in Plaintiff's case. (SUF 100.) Dr. Bangi noted that Plaintiff walked in and out of this appointment without any difficulty. (SUF 101.) What Dr. Bangi found noteworthy was that Plaintiff was now claiming ADA status (i.e., that he was a disabled inmate) and he was adamant about getting methadone. (SUF 102.) After several minutes, Plaintiff became argumentative and left. (SUF 103.) Dr. Bangi decided to continue the pain-medication regimen of Tylenol and Mobic for the time being. (SUF 104.)

### e. The July 28, 2011 appointment.

Dr. Bangi met with Plaintiff again in July 2011, for follow up to discuss his numerous chronic conditions. (SUF 105.) Plaintiff was still taking Mobic for his pain, but said it was not fully effective and he wanted to try something new, like Disalcid (another NSAID used for pain relief). (SUF 106.) Dr. Bangi discontinued the Mobic and wrote a prescription for Disalcid, as Plaintiff requested. (SUF 107.) Dr. Bangi also noted that there continued to be no indication for use of methadone, or other non-formulary medications like Neurontin or Tramadol, and he

counseled Plaintiff about continuing his home exercise program. (SUF 108.) Plaintiff said that he still was not interested in physical therapy. (SUF 109.) Dr. Bangi did not see any problems with Plaintiff's gait during the visit. (SUF 110.) Dr. Bangi discussed several of Plaintiff's chronic conditions in addition to his lower back pain. (SUF 111.) This meeting lasted 10-15 minutes. (SUF 112.)

### f. The November 14, 2011 meeting.

Dr. Bangi saw Plaintiff again in November 2011, after he was referred from the nurses' line for back discomfort. (SUF 113.) As Dr. Bangi stepped out of the examination room, Plaintiff confronted him in the hallway, complaining, "This has got to stop. You are not providing me anything for pain, like the other doctors in other institutions. You are all wrong!" (SUF 114.) Plaintiff was moving without any apparent problems as he was walking towards Dr. Bangi. (SUF 115.) Dr. Bangi offered to discuss Plaintiff's concerns in the exam room, but Plaintiff continued his tirade in the hallway. (SUF 116.) Plaintiff accused Dr. Bangi of not doing anything for his back pain, of ignoring other doctors' findings, and he was upset that Dr. Bangi would not prescribe methadone or issue a lower bunk chrono. (SUF 117.) Dr. Bangi reminded Plaintiff that his case had been discussed at the MARC, and the doctors on that committee concurred that narcotic pain medications were not indicated. (SUF 118.) Dr. Bangi further explained that the committee had considered imaging studies and the findings of two independent medical providers who had considered and denied his administrative appeal requesting methadone and a lower bunk chrono. (SUF 119.) Dr. Bangi also reminded Plaintiff that he had declined physical therapy in the past, as well as other non-narcotic pharmaceutical interventions. (SUF 120.) Plaintiff began shouting, "You are wrong. I understand what you are doing. Give me your medical board license number. I will file a lawsuit. I'm already talking to my attorney and my wife about this." (SUF 121.) Then he stormed out of the clinic. (SUF 122.) This meeting lasted no longer than 5-8 minutes. (SUF 123.)

Based on his review of Plaintiff's case history, the findings by other doctors at SCC and previous institutions, and the MARC's recommendations, Dr. Bangi found that narcotics were still not appropriate, and he chose to continue to treat Plaintiff with NSAIDs for his pain. (SUF 124.)

1  When they met in November 2011, Plaintiff was taking Clonidine. (SUF 125.) Clonidine is used
2  in combination with other pain-management medications for patients with nerve pain, and Dr.
3  Bangi had recently prescribed it as a supplement to be taken in combination with the Disalcid.
4  (SUF 126.)

### g. The January 23, 2012 appointment.

Dr. Bangi saw Plaintiff again in January 2012, to discuss his laboratory results and to follow up on several of his chronic conditions. (SUF 127.) Plaintiff did not suggest that his back pain was an issue that needed to be addressed at that time. (SUF 128.) In the progress notes, Dr. Bangi noted that Plaintiff's pain appeared to be under control and stable, and that he would continue with the current medication regimen. (SUF 129.)

### h. The August 1, 2012 meeting.

Dr. Bangi met with Plaintiff once more in August 2012, to discuss his x-rays, as well as his request to discontinue the Tegretol prescription. (SUF 130.) As in many of the previous meetings, Plaintiff listed a litany of medications he had taken, including Prednisone, Gabapentin, Tramadol, Methadone, OxyContin, Morphine, Salsalate, Mobic, Ibuprofen, Indomethacin, and Naproxin. (SUF 131.) Plaintiff was still taking Clonidine at the time of the meeting. (SUF 132.)

Once again, Plaintiff asked Dr. Bangi to issue him a low-dose prescription for Methadone based on discussions Plaintiff had allegedly had with Dr. Allen. (SUF 133.) Plaintiff mentioned Dr. Allen several times, suggesting that Dr. Bangi should follow his recommendations for methadone, but Dr. Bangi reviewed Plaintiff's record and was unable to find any such recommendation by Dr. Allen or any provider at SCC. (SUF 134.) When Dr. Bangi explained to Plaintiff that no narcotic medications would be issued, he became argumentative and threatened to file an administrative grievance regarding the visit. (SUF 135.) As with several of the other meetings, Dr. Bangi documented that Plaintiff appeared to be walking without any difficulty when he left. (SUF 136.) This appointment lasted approximately 10 minutes. (SUF 137.)

**7. Numerous other physicians at the Sierra Conservation Center arrived at the same conclusion as Dr. Bangi: a narcotic medication was not medically appropriate in Plaintiff's case.**

Dr. Bangi was not the only physician at SCC who found Plaintiff's pain complaints to be inconsistent with his observable behaviors. (SUF 138.) Dr. Forster, for instance, reviewed and denied Plaintiff's administrative grievance which requested methadone, also finding that it was not medically indicated. (SUF 139.) Plaintiff had filed this grievance just two weeks after seeing Dr. Bangi for the first time in March 2011. (SUF 140.)

In May 2011, Dr. Thomatos also interviewed Plaintiff in connection with a separate administrative grievance. (SUF 141.) In this grievance, Plaintiff had requested a lower bunk chrono because he claimed to have trouble getting up and down from a top bunk. (SUF 142.) But at the interview, Plaintiff got up and walked out of the room after learning that Dr. Thomatos would not be issuing a lower-bunk chrono. (SUF 143.) Dr. Thomatos noted that Plaintiff was able to sit, stand, and walk without any difficulty. (SUF 144.)

In June 2012, Dr. Smith evaluated Plaintiff in connection with a third grievance. (SUF 145.) Dr. Smith's progress notes show that Plaintiff moaned whenever he sat down, and that he was walking throughout the clinic with an exaggerated limp. (SUF 146.) Dr. Smith also noted, however, that Plaintiff's limp seemed to resolve entirely when he was on the exercise yard moments later. (SUF 147.) Dr. Smith further observed that while Plaintiff was in the examination chair, he was able to rotate his torso rapidly, and he swung both arms with pronounced gestures, especially as he grew more agitated throughout his visit. (SUF 148.)

In summer 2012, the Chief Medical Officer became concerned with the conflict between Plaintiff's observable behaviors and the level of pain he claimed to be experiencing. (SUF 149.) The CMO asked some Correctional Officers at SCC to videotape Plaintiff on the recreation yard. (SUF 150.) The video showed Plaintiff exercising vigorously, doing burpees and push-ups against an inclined bar, and walking briskly in the main exercise yard. (SUF 151.)  This video was consistent with Dr. Bangi's own experiences with Plaintiff: he presented with a limp and other conspicuous displays of pain in the clinic, but his objective behaviors when he thought staff were not watching suggested that Plaintiff was functioning just fine on his prescribed medications, and that there was no need for narcotics, especially methadone. (SUF 152.)

///

### B. Defendant's Argument

Dr. Bangi argues that his evidence shows that he was not deliberately indifferent to Plaintiff chronic back pain. The evidence Dr. Bangi submits squarely refutes Plaintiff's allegations that Dr. Bangi only prescribed aspirin for his back pain; rather, it shows that Dr. Bangi attempted to find some pain relief for Plaintiff by prescribing a number of non-narcotic medications (SUFs 47, 48, 81-85, 104, 107, 124-126) and, on more than one occasion, offered to prescribe physical therapy which Plaintiff declined (SUFs 64, 65, 108, 109, 120). Dr. Bangi also submits evidence that Plaintiff fabricated the extent of his pain and his past medical history to Dr. Bangi and other physicians. (SUFs 40, 41, 50-54, 63, 71-80, 86-88, 101, 110, 134, 136, 138, 139, 141-152.) Finally, Dr. Bangi's evidence shows that he took Plaintiff's condition and concerns to the Medical Authorization Review Committee ("MARC") which also found that narcotic medications were not indicated. (SUFs 91-100, 124.) All of this evidence shows that Dr. Bangi was not deliberately indifferent to Plaintiff's chronic back pain.

The Court finds that, as to Plaintiff's claim that Defendant Dr. Bangi was deliberately indifferent to his serious medical needs, Defendant has met his initial burden of informing the Court of the basis for his motion and identifying admissible evidence to demonstrate the absence of a genuine issue of material fact. The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of his contention that the dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *First Nat'l Bank*, 391 U.S. at 289; *Strong v. France*, 474 F.2d 747, 749 (9th Cir. 1973).

### V.     Plaintiff's Opposition

In opposition to Defendant's motion, Plaintiff submits a document titled as his notice of opposition and opposition which, for all practical purposes, is his memorandum of points and authorities (Doc. 46); a Statement of Undisputed Facts (Doc. 48); a Statement of Disputed Facts

(Doc. 40); and his declaration (Doc. 47.)  Despite having been presented with the requirements to oppose a motion for summary judgment (Doc. 34), Plaintiff's efforts are insufficient to meet his burden.

First, Plaintiff was advised that "in opposing Defendant's motion for summary judgment, Local Rule 260(b) requires Plaintiff to reproduce Defendant's itemized facts in the Statement of Undisputed Facts and admit those facts which are undisputed and deny those which are disputed. If Plaintiff disputes (denies) a fact, Plaintiff must cite to the evidence used to support that denial (e.g., pleading, declaration, deposition, interrogatory answer, admission, or other document). Local Rule 260(b)."  (Doc. 34, Amd. 2nd Info O, 3:1-5.)  However, while Plaintiff submitted a Statement of Disputed Facts (Doc. 49), he failed to identify which of Defendant's statements of undisputed facts he intended to dispute via any of the paragraphs of factual assertions he lists; nor is any such correlation discernable, even with considerable effort.

Further, while Plaintiff's Statement of Disputed Facts is purportedly supported by his own declaration, the paragraph(s) of his own declaration to which he cites do not necessarily support the assertion made in Plaintiff's Statement of Disputed Facts.  For example, Plaintiff's disputed fact #4 states "Prior to Dr. Bangi's care in those years and then after.  [sic] Those doctor's took Plaintiff's MRI's and specialist's reports to the MARC.  The MARC approved pain management regimen consisting of Gabapentin, Methadone and Tramadol. (Dumas, Decl. para. 18.)"  (Doc. 49, 2:24-3:1.)  However, paragraph 18 of Plaintiff's declaration states "At every meeting with Dr. Bangi, I would ask why doesn't he do anything.  Other doctors have sent me to specialist [sic] and order MRI's.  They all gave me proper medical care.  He would not respond to this.  It only would make him mad."  (Doc. 47, 6:18-23.)  The Court is not required and declines to attempt to correlate Plaintiff's evidence with the facts he purports establish a dispute where Plaintiff has failed to do so.  Fed. R. Civ. Pro. 56(c)(1).

Also, Plaintiff's statement of disputed facts is only supported by his own declaration. (*See generally* Doc. 49.)  Yet Plaintiff does not show that he has knowledge or special training on medical issues upon which this Court should accept his opinion to contradict physicians on medical issues.  Thus, the Court need not accept statements in Plaintiff's declaration such as "All

16

1  [the MARC] would say is there is nothing in my medical file to indicate any drugs other than

2  NSAID and I seem to move fine, so there is no need for a lower tier or bunk chrono.  Dr. Bangi's

3  failure to do any medical evaluation, again left my file empty of proper diagnostic so it can be

4  reviewed properly."  (Doc. 47, 7:6-13.)  Further, Dr. Bangi submitted numerous medical records

5  reflecting his examinations/evaluations of Plaintiff during numerous visits, but Plaintiff provides

6  no evidence to attack their veracity other than his own lay opinion that they are insufficient.

7  At best, Plaintiff's evidence shows he disagreed with the course Dr. Bangi chose for his

8  medical treatment.  For example, Paragraph 17 of Plaintiff's declaration (Doc. 47, 6:1-16) states:

> Dr. Bangi said he was taken [sic] me to MARC for pain management.  After he did, he called me in.  Dr. Bangi said MARC denied narcotics and only ok [sic] NSAID.  That my medical file did not indicate the need for anything else.  I said how can you present my case when you never looked at my back, ordered a MRI, or sent me to a specialists [sic].  Dr. Bangi said there was no need to.  I argued that his relying on CSP doctor reports is all wrong.  I said they could not do anything for me, no MRIs or specialist referrals because at [sic] my short stay.  This only made Dr. Bangi mad when I confronted him with this.  He would kick me out of his office and I would leave mad.

14  Plaintiff fails to show anything more than a difference of opinion between himself and Dr.

15  Bangi regarding his diagnosis, treatment, and applicable use of his medical records.  This is

16  insufficient to meet Plaintiff's burden in opposing a motion for summary judgment and does not

17  even show violation of Plaintiff's rights under the Eighth Amendment.  *See Estelle v. Gamble*,

18  429 U.S. 97, 107 (1976).  Before it can be said that a prisoner's civil rights have been abridged

19  with regard to medical care, "the indifference to his medical needs must be substantial.  Mere

20  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

21  *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.1980) (citing *Estelle*, 429 U.S. at

22  105-06). *See also Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004).

23  Finally, Plaintiff's own evidence acknowledges that Dr. Bangi authorized and variously

24  ordered a variety of NSAIDs for Plaintiff's back pain.  (Doc. 47, 4:9-5:12, 6:1-16.)  The fact that

25  Dr. Bangi ordered medications for Plaintiff's pain negates deliberate indifference by Dr. Bangi.

26  That it was not the medication Plaintiff desired rises merely to a difference of opinion as to

27  desirable treatment options, but not to deliberate indifference.

28  Plaintiff fails to meet his burden to show a disputed issue of material fact to thwart

granting of Defendant's motion for summary judgment.

## VI. Qualified Immunity

Defendant's motion for qualified immunity need not be reached since he is entitled summary judgment on the merits of Plaintiff's claim in this action.

## VII. Conclusions and Recommendations

As set forth herein, the Court HEREBY RECOMMENDS:

(1) that Defendant Dr. Bangi is entitled to judgment as a matter of law such that his Motion for Summary Judgment, filed November 21, 2013 (Doc. 32), should be GRANTED; and

(2) that the Clerk of the Court be directed to enter judgment for the Defendant Dr. Bangi and against Plaintiff.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **July 26, 2014**                     /s/ Jennifer L. Thurston
                                             UNITED STATES MAGISTRATE JUDGE